COASTAL STATES ENERGY
COMPANY, Plaintiff,

v.

James G. WATT, Secretary of the United
States Department of the Interior;
Robert F. Burford, Director of the Bu-
reau of Land Management, United
States Department of the Interior;
Robert Lopez, Chief, Minerals Section,
Utah State Office of the Bureau of
Land Management, United States De-
partment of the Interior; and the Unit-
ed States Department of the Interior,
Defendants.

No. C 83–730J.

United States District Court,
D. Utah, C.D.

Aug. 2, 1985
Opinion and Order Jan. 17, 1986.

Lawrence E. Stevens and Patrick Garver, Salt Lake City, Utah, Kevin Yocum c/o Law Dept., Coastal States Energy Co., Houston, Tex., Brian McGee, Denver, Colo., for plaintiff.

Peter Stirba, Asst. U.S. Atty., Salt Lake City, Utah, for defendants.

K.L. McIff, Richfield, Utah, for amicus curiae.

## ON CROSS MOTIONS FOR SUMMARY JUDGMENT

JENKINS, Chief Judge.

This matter came before the court on cross motions for summary judgment. It raises questions concerning the interpretation of two coal leases between the United States and Coastal States Energy Company. It also raises questions concerning the federal laws and administrative regulations that apply to those leases.

On August 27, 1984, the court heard oral arguments on the cross motions. Lawrence Stevens and Brian McGee appeared for the plaintiff, Coastal States. Peter

Stirba, Assistant U.S. Attorney, appeared for the defendant Watt (the "Secretary") and for the other United States defendants. K.L. McIff appeared for amicus Unelco, Inc. Sierra Pacific Power Co. and the Utah Mining Association each filed an amicus memorandum in support of Coastal States' motion for summary judgment. Unelco, Inc. and the State of Utah each filed an amicus memorandum in support of the Secretary's motion for summary judgment. At the conclusion of oral arguments on the motions, the court took the matter under advisement. Now, after considering the extensive memoranda filed by the parties and after reviewing the record, the court enters this memorandum opinion.

The facts are not disputed. On September 11, 1941, the United States, as lessor, and Lorenzo R. Hansen, as lessee, entered into coal lease number SL062583 (the "SL Lease"). On March 1, 1962, the United States, as lessor, and Southern Utah Fuel Company and Equipment Rental Service, as lessees, entered into coal lease number U062453 (the "U Lease"). Both the SL Lease and the U Lease were issued pursuant to the Mineral Lands Leasing Act of 1920, 30 U.S.C.A. § 207 (1971) (amended Aug. 4, 1976, 90 Stat. 1087) (the "Act of 1920"). Coastal States, the successor to the original lessees, operates an underground coal mine of which the SL and the U leases form a major part.

Both the SL Lease and the U Lease gave the United States the right "to readjust and fix royalties payable hereunder and other terms and conditions at the end of 20 years from the date hereof and thereafter at the end of each succeeding 20-year period during the continuance of this lease." U Lease, section 3(d); *see also* the SL Lease, section 3. Both leases provided for royalty payments of 15 cents per ton,

which was well in excess of the 5 cents per ton minimum royalty required by the Act of 1920. *Id.* Both leases also provided for quarterly royalty payments, as required by law. *Id.*

In 1961, at the end of the first 20-year period of the SL Lease, the SL Lease was readjusted from 10 cents to 15 cents per ton.[1] On July 9, 1981, approximately two months before the end of the second 20-year period, the Bureau of Land Management ("BLM") notified Coastal States that the terms and conditions of the SL Lease would be readjusted. That notice informed Coastal States that the proposed readjustment terms and conditions would be forwarded to Coastal States within two years, and that readjustment would become effective 60 days later. On September 28, 1981, 17 days after the second 20-year period expired, the BLM sent Coastal States a Notice of Proposed Readjustment of Lease ("SL Lease Notice of Proposed Terms").

On October 9, 1981, approximately four and one-half months before the end of the first 20-year period of the U Lease, the BLM notified Coastal States that the terms and conditions of the U Lease would also be readjusted. This notice informed Coastal States that the proposed readjusted terms and conditions would be forwarded to Coastal States within two years, and that readjustment would become effective 60 days later. On December 24, 1981, about two months before the end of the 20-year period, the BLM sent Coastal States a Notice of Proposed Readjustment of Lease ("U Lease Notice of Proposed Terms").

The proposed terms and conditions of both leases were the same. The royalty rate would change from 15 cents per ton to 8 percent of the value of the coal removed by underground mining.[2] The lease bond

---

1. The royalty rate had previously been reduced to 10 cents per ton as a result of economic hardship.

2. The "value" of coal was defined by regulation as follows:

    Where only crushing, storing, and loading are performed prior to the point of sale, the

value of the coal for royalty purposes shall be the gross value at the point of sale. . . .

    The gross value shall be the sale or contract unit price times the number of units sold.
30 C.F.R. § 211.63 (1981).

would be increased from $3,000 to $450,000, and the royalty payments would be monthly rather than quarterly. The proposed readjusted terms were all a result of section 6(a) of the Federal Coal Leasing Amendments Act of 1976, 90 Stat. 1083, 1087 (1976), codified at 30 U.S.C. § 207(a) (1982), which amended the Mineral Leasing Act of 1920.

Coastal States timely filed objections to the proposed readjustment on both leases, and the BLM promptly overruled those objections. Coastal States then appealed to the Interior Board of Land Appeals, which upheld the BLM decision. 70 IBLA 386, Feb. 9, 1983. Having failed to persuade the IBLA, Coastal States filed this lawsuit to obtain judicial review pursuant to section 10 of the Administrative Procedure Act, 5 U.S.C. §§ 701–06 (1982), of a final administrative decision of the IBLA, and to challenge the legality of certain regulations and practices of the Department of the Interior. Following a brief period of discovery, both parties filed motions for summary judgment.

## I. TIMELINESS.

Coastal States argues strenuously that the lease readjustments were not timely. The applicable law, the regulations, and the terms of the leases themselves allow readjustment "at the end of" twenty years from the date of the lease and "at the end of" each succeeding twenty-year period. Coastal States asserts that for a readjustment to be effective, it must be final before the end of a twenty-year period. The United States takes the position that a readjustment is effective so long as a notice of intent to readjust is given prior to the end of a 20-year period.

### A. The Court of Appeals Decision in Rosebud.

Both parties assert that *Rosebud Coal Sales Co. v. Andrus,* 667 F.2d 949 (10th Cir.1982), is dispositive. In *Rosebud,* the Department of the Interior attempted to readjust a lease by giving notice of intent to readjust about two and one-half years after the end of the 20-year period. The Court of Appeals concluded that the readjustment was not timely: "[T]he readjustment was to be when each twenty-year period expired, on that date and not at a later time." *Id.* at 951.

In this case, unlike in *Rosebud,* notice was given prior to the end of the 20-year period. *Rosebud* did not decide whether notice of intent to readjust, or even notice of the proposed terms, given prior to the end of the 20-year period would satisfy the regulations, the statute, or the terms of the leases. However, although *Rosebud* is not dispositive, it is instructive. *But see., FMC Wyoming Corp. v. Watt,* 587 F.Supp. 1545 (D.Wyo.1984) (*Rosebud* requires the conclusion that notice given prior to the anniversary date makes readjustment timely); *see also, Gulf Oil Corp. v. Clark,* 631 F.Supp. 29 (D.N.M.1985) ("All *Rosebud* requires is that notice of readjustment be given on or before the twenty-year anniversary date of the leases," relying on *FMC*).

### B. Interpretation of the Leases.

In determining the meaning of a coal lease issued under the Act of 1920, this court must "consider the entire contract in the context of the Mineral Leasing Act and the regulations." *Rosebud,* 667 F.2d at 951. The court must also recognize typical contract law doctrines applicable to commercial transactions and apply ordinary meaning to the terms of the lease agreements. *Id.*

The Act of 1920 provided that the United States could lease coal lands under certain conditions. One of those conditions was that the United States retained the right to readjust the terms and conditions of the lease:

[A]t the end of each twenty-year period succeeding the date of the lease such readjustment of terms and conditions may be made as the Secretary of the Interior may determine unless otherwise provided by law at the time of the expiration of such periods.

30 U.S.C.A. § 207 (1970) (amended Aug. 4, 1976, 90 Stat. 1087). Both the SL Lease and the U Lease contained language patterned after the Act of 1920:

It is mutually understood and agreed that the lessor shall have the right to readjust and fix the royalties payable hereunder and other terms and conditions at the end of 20 years from the date hereof and thereafter at the end of each succeeding 20-year period during the continuance of this lease unless otherwise provided by law at the time of the expiration of any such period, but in case the lessee be dissatisfied with the rate of royalty or other terms and conditions so fixed, he may terminate this lease.

SL Lease, section 3; *see also* the U Lease, section 3(d).

In 1976, Congress enacted the Federal Coal Leasing Amendments Act, 90 Stat. 1083 (1976), which amended the Act of 1920. The provisions relevant here are as follow:

A lease shall require payment of a royalty in such amount as the Secretary shall determine of not less than 12½ per centum of the value of coal as defined by regulation, except the Secretary may determine a lesser amount in the case of coal recovered by underground mining operations.... Such rents and royalties and other terms and conditions of the lease will be subject to readjustment at the end of its primary term of twenty years and at the end of each ten-year period thereafter if the lease is extended.

30 U.S.C. § 207 (1982).

The regulations in effect in 1981, the time the two leases were subject to readjustment, provided that all leases issued before August 4, 1976, the date the 1976 Act became law, "shall be subject to readjustment at the end of the current 20-year period and at the end of each 10-year period thereafter." 43 C.F.R. § 3451.1(a)(1) (1981). The regulations further provided that any lease that, at the time of readjustment, has a royalty rate of less than the minimum royalty prescribed in 43 C.F.R. § 3473.3–2 "shall be readjusted to conform to the minimum prescribed in that section." 43 C.F.R. § 3451.1(a)(2) (1981). Section 3473.3–2 provided as follows:

(2) A lease shall require payment of a royalty of not less than 12½ percent of the value of the coal removed from a surface mine.

(3) A lease shall require payment of royalty of not less than 8 percent of the value of coal removed from an underground mine, except that the authorized officer may determine a lesser amount, but in no case less than 5 percent if conditions warrant.

43 C.F.R. § 3473–2(a) (1981).

In addition, the regulations provided that the Secretary

shall, prior to the expiration of the current or initial 20-year period or any succeeding 10-year period thereafter, notify the lessee of any lease which becomes subject to readjustment after June 1, 1980, whether any readjustment of terms and conditions will be made prior to the expiration of the initial 20-year period or any succeeding 10-year period thereafter. On such a lease the failure to so notify the lessee shall mean that the United States is waiving its right to readjust the lease for the readjustment period in question.

43 C.F.R. § 3451.1(d)(1) (1981). The regulations further provided that in the notice of intent to readjust, the Secretary must inform the lessee of when the terms for readjustment will be transmitted. "This time ... shall not be longer than 2 years after such notice." 43 C.F.R. § 3451.1(d)(2) (1981). Failure to transmit the proposed terms of readjustment within two years of the notice also waives the government's right to readjust. *Id.*

The regulations also allowed the lessee to object within 60 days to the proposed terms of readjustment. 43 C.F.R. § 3451.2 (1981). If the lessee was not satisfied with the BLM's resolution of the objections, the lessee could appeal to the IBLA. 43 C.F.R. § 3451.2(e) (1981), amended July 30, 1982, 47 F.R. 33146. Judicial review of IBLA decisions is to the district courts pursuant

to the Administrative Procedure Act. 5 U.S.C. §§ 701–06 (1982).

It is apparent from these regulations that readjustment is a process—not a single act. The process is initiated by notice of intent to readjust. The readjusted terms do not become final until several months, or even years, later.[3] Because readjustment is a process, it would be illogical to conclude that readjustment must take place, if at all, "at" a particular time, unless the word "at" is broad enough to include the entire period of time required for readjustment.

The regulations also indicate that although the BLM can control the time the readjustment process begins, the BLM cannot completely control how long the process will take in a given instance. The entire time required for readjustment can vary from as little as 60 days (if the BLM submits proposed terms with its notice of intent to readjust and if the lessee does not object to those terms) to as long as three, four, or perhaps five years (if the lessee advances significant objections and vigorously pursues an appeal). If either the law or the leases themselves required the terms to be final prior to the end of a 20-year period, to be assured of an opportunity to readjust, the BLM would either have to begin the readjustment process several years before the end of a 20-year period, or deny lessees the privilege of participating in the readjustment process.

The BLM would likely be reluctant to fix adjusted terms and conditions without allowing a lessee to participate in the readjustment decision. The IBLA has suggested that "the spirit of the statute and the

regulations are ... clearly in favor of allowing lessees to voice their objections and to negotiate terms and therefore not to be cut off unilaterally and arbitrarily from the process of changing the terms of a lease." *United States Steel Corp.*, 50 IBLA 252, 254 (1980).

And if the BLM must begin the readjustment process years in advance, the readjusted terms would then reflect market conditions at the time it began the readjustment process rather than market conditions "at the end of" the 20-year period. In an age of rapidly increasing prices for fossil fuels, the United States would never fully benefit from its contractual right to readjust if it could not fix the readjustment terms to reflect market conditions that exist at the time the readjusted terms become effective. The plain language of both the leases and the Act of 1920 does not put the United States in such an uncertain position.

Moreover, if the readjusted terms must be final before the 20-year period expires, a lessee would have an economic incentive to prevent those terms from becoming final before the expiration date. That could result in frivolous or unnecessary objections and appeals, ultimately increasing the cost of readjustment both to the United States and to its lessees.[4]

■ Based on an examination of the entire lease in the context of the Mineral Leasing Act and the regulations, the court interprets the language in the leases that requires the BLM to readjust the terms and conditions of the leases, if at all, "at the end of" the 20-year period, to allow readjustment if the process is begun prior to the expiration of the 20-year period.[5]

**3.** Coastal States takes the position in this motion that *"at a minimum,* a final BLM readjustment decision is necessary" prior to the end of the 20-year period. Memorandum in Support of Plaintiff's Motion for Summary Judgment, filed May 3, 1984, p. 7, n. 3. However, Coastal States suggests that "[i]n an appropriate case, it may be determined that a final decision of the Department of the Interior, rather than BLM, is necessary to accomplish a readjustment." *Id.*

**4.** The United States does not claim and there is no evidence that Coastal States filed a frivolous

appeal or that Coastal States in bad faith prevented proposed terms from becoming final prior to the expiration of a 20-year period. The court has considered only the possibility that a hypothetical lessee would have an economic incentive to do so.

**5.** The court also interprets similar language in the applicable regulations to allow readjustment if the BLM begins the process prior to the end of a 20-year period. Some of the language in 43 C.F.R. § 3451.1(d)(1) (1981) indicates that readjustment must be complete before the end of a

The leases do not require readjustment "prior to" the end of a period, and they do not require that the readjusted terms be final "at the end of" a period. They merely require that the process of readjustment take place over a period of time "at the end of" a period.

Coastal States' conduct is consistent with this interpretation. In its comments to the 1979 proposed changes to 43 C.F.R. § 3451, Coastal States noted that the regulation did not provide a time within which the BLM must notify the lessee of readjustment in order to avoid waiving its right to readjust. Coastal States suggested that "the United States be required to give such notice within six months prior to the end of the then current readjustment period." Rulemaking Record, Vol. III, 643, 650. Coastal States also recommended that in the event the United States failed to give notice prior to the end of a period, the United States should have an additional "thirty days after the end of such readjustment period within which to cure its failure to give such notice." *Id.* at 651. These comments indicate that in 1979 Coastal States believed that its lease with the United States did not require the terms of readjustment to be final prior to the end of the 20-year period.[6]

The court's interpretation is consistent with the court of appeals' holding in *Rosebud*. In that case the process did not begin until two and one-half years after the end of the 20-year period. Accordingly, it was not difficult for the court in that case to conclude that the readjustment process did not take place "at the end of" a 20-year period.

The court's interpretation of the leases is also consistent with other language in *Rosebud*.[7] The court of appeals, quoting the district court in that case, indicated that it would have been sufficient for the BLM to

---

period. The regulation requires the Secretary, "prior to the expiration" of a period, to notify the lessee "whether any readjustment of terms and conditions will be made prior to the expiration of the initial 20-year period or any succeeding 10-year period thereafter." Coastal States argues that the repeated use of the phrase "prior to the expiration" indicates that the regulation requires both that the notice be given prior to the end of a period and that the readjustment be complete at the end of the period.

The Secretary, supported by the IBLA, interprets the regulation to require only that notice of intent be given prior to the end of a 20-year period. *See e.g., Lone Star Steel Co.,* 65 IBLA 147 (June 29, 1982).

The court finds that the regulations taken as a whole *support the Secretary's interpretation.* The regulations set out a process that is not consistent with requiring finality prior to the end of a period. In addition, if 43 C.F.R. § 3451.1(d)(1) required the readjustment terms to be final prior to the end of a period, it would not have been necessary to require mere notice prior to the same deadline. The court reaches this conclusion both by an independent evaluation of the regulations, and by giving due deference to an agency's interpretation of its own regulations. *See Environmental Defense Fund Inc. v. Costle,* 657 F.2d 275, 292 (2d Cir.1981) (when judicial construction of an agency's own regulations is in issue rather than a statute, deference to that interpretation is even more clearly in order).

6. One additional comment also deserves notice. Coastal suggested that

Section 3451.1(d) also should be clarified to provide that any readjustment of terms and conditions prior to the exploration (sic—expiration) of the initial twenty year period or any succeeding ten year period thereafter shall not become effective until the end of each such period.

Rulemaking Record, Vol. III, 643, 651. This comment implies that Coastal States believed a readjustment would be effective even if the readjustment was not final prior to the expiration of the period. Otherwise, the clarification would have been unnecessary.

7. Some language in *Rosebud* appears to contradict this court's interpretation of the leases. The court of appeals stated that "the readjustment was to be when each twenty-year period expired, on that date and not at a later time. The statement of time 'at the end of' on its face is not susceptible to any variation as it is a precise time." 667 F.2d at 951. In *Rosebud,* the court did not need to consider the reality that readjustment is a process that does not occur on a single date. Although it is true that the end of the 20-year period is a precise time, the time required for readjustment is not precise at all. Hence it would be illogical to conclude that a process that requires months or even years, must occur either on a fixed date or not at all. Accordingly, had the court of appeals been presented with the issue in this case, it would not have said that a readjustment must take place on the date that the 20-year period expired.

notify the lessee that it intended to readjust the lease.

The Government made no showing that the giving of notice at or before the anniversary date was not "feasible." The trial court found:

The record discloses no reason why notice was not given to Rosebud prior to the readjustment date in compliance with the regulation or why it was not feasible to do so.

667 F.2d at 953. *See also FMC Wyoming Corp. v. Watt*, 587 F.Supp. 1545 (D.Wyo. 1984); *Gulf Oil Corp. v. Clark*, slip op., Civ–84–0157C, (D. New Mex., Apr. 1, 1985).

■■■ In this case the BLM notified Coastal States prior to the end of the 20-year period that it intended to readjust the leases. Coastal States received the proposed terms for the U Lease before the end of the 20-year period, and it received the proposed terms for the SL Lease only 17 days after the end of the 20-year period. In either case, the process of readjustment occurred "at the end of" the period. Accordingly, readjustment was timely.[8]

---

**8.** Coastal States also asserts that the BLM failed to follow an internal memorandum, and that BLM failed to notify the Attorney General of the proposed readjusted terms of the U Lease pursuant to 30 U.S.C. § 184(*l*)(2) (1982). Instruction Memorandum No. 80–463 provided that notices of intent to readjust a lease must be sent "to the lessee at least 120 days prior to the end of the 20 or 10-year period." Record at 2000033. Coastal States argues that because BLM did not notify Coastal States that the SL Lease would be readjusted until about 60 days before the end of the 20-year period, BLM must wait until the end of the next 20-year period to readjust the SL Lease.

Section 184(*l*)(2) provides that "No coal lease may be … readjusted … until at least thirty days after the Secretary of the Interior notifies the Attorney General of the proposed … readjustment." Coastal States argues that because the Secretary did not notify the Attorney General that the U Lease was to be readjusted, BLM must wait another 20 years for an opportunity to readjust.

Coastal States did not raise these arguments before the IBLA. This court cannot set aside an agency determination on a ground not raised before the agency itself. *Unemployment Compensation Commission of Territory of Alaska v. Aragon*, 329 U.S. 143, 155, 67 S.Ct. 245, 251, 91 L.Ed. 136 (1946); *see also*, 4 K. Davis, Administrative Law Treatise 441 (2d Ed.1983).

## C. The Validity of the Regulations.

Coastal States next asserts that 43 C.F.R. § 3451.1 (1981) must be set aside because it is is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.[9] The Administrative Procedure Act requires this court to "hold unlawful and set aside agency action, findings, and conclusions found to be"

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

…;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or]

(D) without observance of procedure required by statute.

5 U.S.C. § 706(2)(A) (1982).[10]

■■■ First, the regulation is not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A). A regulation is arbitrary and capricious

---

**9.** Even though the court interpreted the leases themselves to allow readjustment if notice of intent to readjust is given prior to the end of a 20-year period, the court must nevertheless consider Coastal States' contention that the regulation is invalid. The court interpreted the leases "in the context of the Mineral Leasing Act and the regulations." *Rosebud*, 667 F.2d at 951. If the regulations are invalid, the court's interpretation of the leases could be unsound.

**10.** Section 706 also provides that the court should "hold unlawful and set aside agency action, findings, and conclusions found to be"

(B) contrary to constitutional right, power privilege, or immunity;

….

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

None of these provisions apply here. Coastal States does not claim that 43 C.F.R. § 3451.1 is contrary to a constitutional right, power, privilege, or immunity, that it is entitled to review on the record of an agency hearing, or that the facts are subject to de novo review.

if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Ins. Co.,* 463 U.S. 29, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983). Coastal States does not claim that the Secretary considered factors that Congress did not intend him to consider. Rather, Coastal States asserts that the Secretary did not consider all the important aspects of the timing of readjustment.

The court is satisfied that the Secretary considered the important aspects of the rule before promulgating it. The Secretary published a Notice of Intent to Propose Rulemaking, 42 Fed.Reg. 58776 (1972); he published the proposed rules, 44 Fed.Reg. 16800, 16832–33 (1979); he received comments, including comments from Coastal States, and he incorporated those comments into the final regulations, 44 Fed. Reg. 42584, 42601 (1979). The Secretary set forth at length the comments the agency received, including comments to subpart 3451. No one suggested that a readjustment must be final prior to the expiration of a 20-year period. Rather, the industry objected to readjustment of leases if a lessee is not notified prior to the expiration of a 20-year period of an intent to readjust. The Secretary explained that although he believed it was lawful to readjust leases after the expiration of the 20-year period without giving prior notice of an intent to readjust,[11] the regulation responded to this industry concern by providing that "failure to notify the lessee of readjustment prior to the anniversary date will constitute a waiver of the right to readjust."[12] 44 Fed. Reg. 42584, 42601 (1979). The court will

not require the agency to do more than it did.

In addition, the court does not believe the Secretary offered an explanation for its decision that runs counter to the evidence before the agency, or that the rule is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. Therefore, giving the Secretary's regulation the considerable deference it is due, *Ramoco,* 649 F.2d at 816, the court does not believe that the regulation's substance is arbitrary, capricious, or otherwise not in accordance with law.

■ Second, the Secretary did not promulgate the regulation in excess of his statutory authority. *See* 5 U.S.C. § 706(2)(C). Congress has authorized the Secretary "to prescribe necessary and proper rules and regulations to carry out and accomplish the purposes of the [Act of 1920]. 30 U.S.C. § 189 (1982). Because Congress did not define procedures for readjusting leases, regulations setting forth those procedures are within the Secretary's authority so long as the regulations are not contrary to the Act of 1920, as amended. *See Ramoco Inc. v. Andrus,* 649 F.2d 814, 816 (10th Cir.1981).

The purposes of the Federal Coal Leasing Amendments Act was "to provide a more orderly procedure for the leasing and development of coal presently owned by the United States and to assure its development in a manner compatible with the public interest." H.R.Rep. No. 681, 94th Cong., 2d Sess. 8, *reprinted in* 1976 U.S. Code Cong. & Ad.News 1943. The Secretary's regulation is consistent with the two purposes of the 1976 Act. It provides an orderly procedure for readjusting leases, and, by allowing the terms of readjustment to reflect market conditions that exist at the time of readjustment rather than at some earlier time, it assures that the public will get as fair a return on its coal as is

---

**11.** The explanation was published before the Tenth Circuit ruled in *Rosebud.*

**12.** This section "was roundly criticized by the public interest groups in their comments because they regarded it as an abrogation of authority." 44 Fed.Reg. 42584, 42601 (1979).

possible. The regulation is not contrary to the Act of 1920, and therefore, it was not beyond the Secretary's authority.

■ Third, the Secretary observed procedure required by statute. *See* 5 U.S.C. § 706(2)(D). Coastal States asserts that the Secretary did not publish "a concise general statement of [the regulation's] basis and purpose." 5 U.S.C. § 553(c). However, the court finds that section 553 does not apply to 43 C.F.R. § 3451.1. Section 553 does not apply "to the extent that there is involved ... a matter relating to ... public property ... or contracts." 5 U.S.C. § 553(a)(2). The court finds that 43 C.F.R. § 3451.1 involves a matter relating to public property and public contracts—leases of public coal lands. Section 553 specifically exempts such matters from its provisions.

Even if section 553 did apply here, Coastal States' argument would not be persuasive. Section 553 requires the agency to set forth a statement of basis and purpose sufficient to enable a reviewing court "to see what major issues of policy were ventilated by the informal proceedings and why the agency reacted to them the way it did." *Automotive Parts & Accessories Ass'n. v. Boyd*, 407 F.2d 330, 339 (D.C.Cir. 1968). The Secretary's explanation that the regulation responded to industry concerns by providing that "failure to notify the lessee of readjustment prior to the anniversary date will constitute a waiver of the right to readjust," 44 Fed.Reg. 42584, 42601 (1979), and his further statement that the object of the regulation was to "assure timely and competent administration of leases," *id.*, were a sufficient statement of the basis and purpose of the regulation to satisfy section 553(c).

### D. *Conclusion on Timeliness Issue.*

In conclusion, the court finds that the leases themselves allow readjustment so long as notice of intent to readjust is given prior to the end of a 20-year period. This finding is based on a consideration of the entire contract in the context of both the Mineral Leasing Act, as amended, and the regulations. The court also finds that 43

C.F.R. § 3451.1 (1981) is not arbitrary, capricious, or an abuse of discretion. Accordingly, Coastal States' Motion for Summary Judgment on its first two causes of action should be denied, and the Secretary's Motion for Summary Judgment on Coastal States' first two causes of action should be granted.

### II. LEGALITY OF THE READJUSTED TERMS.

Coastal States' Third Cause of Action alleges that the terms of readjustment of the two leases were unlawful in several respects. First, Coastal States challenges the applicability of the FCLAA minimum royalty provisions to leases entered into before the FCLAA was enacted. Second, Coastal States argues that 43 C.F.R. § 3473.3–2 (1981), which provides that the minimum royalty on coal removed from an underground mine is 8 percent, "except that the Minerals Management Service may determine a lesser amount, but in no case less than 5 percent if conditions warrant," lacks a rational basis and is arbitrary, capricious, and an abuse of discretion. Third, Coastal States argues that if 43 C.F.R. § 3473.3–2 is not contrary to law, the Secretary's interpretation of the regulation is arbitrary, capricious, and an abuse of discretion. Finally, Coastal States asserts that the royalty rate imposed at the time of readjustment constitutes a taking of Coastal States' contractual property rights without just compensation in violation of the Fifth Amendment to the Constitution of the United States.

The Secretary opposes each of these arguments, and asserts that the royalty provisions imposed at the time of readjustment were lawful. The court finds it necessary to reach only the first of Coastal States' arguments.

### A. *Applicability of the FCLAA Royalty Provisions to Readjustment of a Pre-FCLAA Lease.*

When BLM readjusted the two leases, it changed the production royalty from 15 cents per ton to 8% of the value of coal

removed by underground mining operations. BLM imposed the 8% royalty rate on the basis that 8% was the minimum royalty rate allowed by the FCLAA. Coastal States argues that the royalty rate provisions of the FCLAA do not apply to readjustment of leases entered into before the FCLAA was enacted. In essence, Coastal States takes the position that because it entered its leases while the Mineral Leasing Act was in force, only the royalty provisions of that Act apply to its leases.

The Secretary argues that when a pre-FCLAA lease is readjusted, the FCLAA royalty provisions become applicable. The Secretary relies on two separate theories. First, he asserts that the terms of the leases themselves incorporate statutes in effect at the time of readjustment. Second, he asserts that the language of the statute makes it apply to pre-FCLAA leases.

*1. The Language of the Leases.* The Secretary's argument that the leases themselves incorporate statutes existing at the time of readjustment cannot withstand close scrutiny. The leases provided as follows:

> It is mutually understood and agreed that the lessor shall have the right to readjust and fix the royalties payable hereunder and other terms and conditions at the end of 20 years from the date hereof and thereafter at the end of each succeeding 20-year period during the continuance of this lease *unless otherwise provided by law at the time of the expiration of any such period,* but in case the lessee be dissatisfied with the rate of royalty or other terms and conditions so fixed, he may terminate this lease.

SL Lease, section 3; *see also* the U Lease, section 3(d) (emphasis added).

Similarly, the Act of 1920 provided as follows:

> [A]t the end of each twenty-year period succeeding the date of the lease such readjustment of terms and conditions may be made as the Secretary of the Interior may determine, *unless other-*

*wise provided by law at the time of the expiration of such periods.*

30 U.S.C.A. § 207 (1971) (repealed) (emphasis added).

■ The Secretary argues that the lease provision, "unless otherwise provided by law at the expiration of any such period," allows the BLM to include the royalty provisions of the FCLAA in a lease at the time of readjustment. The court disagrees. The "unless otherwise provided by law" language modifies the right to readjust. In other words, the Secretary has the right to readjust unless the law in effect at the time of readjustment has taken that right away. The "unless otherwise provided by law" language does not incorporate statutes in effect at the time of readjustment.

■ *2. The terms of the FCLAA.* The Secretary's second theory is that the terms of the FCLAA apply its royalty provisions to pre-FCLAA leases at the time of readjustment. Coastal States argues that because Congress did not manifest "by clear and unequivocal expression," *Gibbons v. Pan American Petroleum Corp.,* 262 F.2d 852, 855 (10th Cir.1958), an intention to apply the FCLAA retroactively, the royalty provisions contained in the FCLAA cannot be applied to a pre-FCLAA lease. Coastal States' argument assumes that applying the FCLAA royalty provisions to a pre-FCLAA lease at the time of readjustment would constitute retroactive application of the FCLAA. The court cannot accept this assumption.

The court agrees with the general proposition that "a retrospective operation will not be given a statute which interferes with antecedent rights ... unless such be 'the unequivocal and inflexible import of the terms, and the manifest intention of the legislature.'" *Greene v. United States,* 376 U.S. 149, 160, 84 S.Ct. 615, 621–22, 11 L.Ed.2d 576 (1964), quoting *Union Pacific R.R. Co. v. Laramie Stock Yards Co.,* 231 U.S. 190, 199, 34 S.Ct. 101, 102, 58 L.Ed.2d 179 (1913). However, the court does not believe that applying the royalty provisions of the FCLAA to a pre-FCLAA lease at the

time of readjustment would interfere with antecedent rights.[13] The United States specifically reserved the power to readjust the leases, both in the leases themselves and in the Act of 1920. Implicit in that power is the authority to fix a minimum royalty by legislation. For Congress to do so would in no way alter the rights that the original leases gave to Coastal States. Accordingly, applying the FCLAA royalty provisions to a pre-FCLAA lease at the time of readjustment would not constitute retroactive application of the FCLAA.[14]

Because applying the FCLAA minimum royalty provisions to a pre-FCLAA lease at the time of readjustment would not constitute retroactive application of the FCLAA, it is not necessary to find "clear and unequivocal" congressional expression of such an intent. However, the court must still examine the statute, using the usual—yet less restrictive—tools of statutory construction, to determine whether Congress intended the minimum royalty provisions to apply to pre-FCLAA leases upon readjustment.

The language of the statute itself is ambiguous. It does not expressly indicate whether the its minimum royalty provisions apply to pre-FCLAA leases at the time of readjustment. It merely states that a coal lease

shall require payment of a royalty in such amount as the Secretary shall determine of not less than 12½ percentum of the value of coal as defined by regulation, except the Secretary may determine a lesser amount in the case of coal recovered by underground mining operations.

30 U.S.C. § 207(a) (1982). It does not distinguish between leases entered into before it became effective and leases entered into after it became effective.

The legislative history of the FCLAA is mixed. It supports both the view that the FCLAA minimum royalty provisions apply to pre-FCLAA leases at the time of readjustment and the view that the minimum royalty provisions apply only to new leases. Representative Mink, Chair of the House Subcommittee on Mines and Mining, noted that "[t]he 533 existing federal leases would be unaffected by the Bill except to the extent its provisions are made applicable upon the periodic ten year readjustment of lease terms, or upon the inclusion of an existing lease in a logical mining unit." 122 Cong.Rec. H489 (1976). In recommending adoption of the FCLAA, the House Committee on Interior and Insular

---

**13.** The simple fact that the leases were entered into before the FCLAA was enacted does not inevitably lead to the conclusion that applying the terms of the FCLAA to the leases is retrospective application of the Act. "A statute is not rendered retroactive merely because the facts or requisites upon which its subsequent action depends, or some of them, are drawn from a time antecedent to the enactment." *Reynolds v. United States,* 292 U.S. 443, 449, 54 S.Ct. 800, 803, 78 L.Ed. 1353 (1934).

**14.** Relying in part on certain language in *Rosebud,* the district court in *FMC Wyoming* held that applying the minimum royalty provisions of the FCLAA is retroactive application of the FCLAA. 587 F.Supp. at 1548. The Court of Appeals in *Rosebud,* stated:

The Section 7 amendment [of the FCLAA] provided for a primary term and also for the royalty to be not less than 12.5%. There is no suggestion whatever that the amendment was to be retroactive and the contrary is indicated. 667 F.2d at 952. After quoting the Court of Appeals' language in *Rosebud,* the Wyoming court concluded that

The readjustment of existing leases is not a new event, rather it is an ongoing part of the original lease. To mandatorily apply a minimum royalty of 12½% is in essence to alter the original lease issued ... with a 17½ cent royalty rate imposed under a statutory minimum royalty rate of 5 cents per ton.... Now defendants['] attempt to change the method of readjustment *and* the minimum royalty rate is a change of the original lease and thereby a retroactive application of the 1976 amendment.

587 F.Supp. at 1548 (emphasis in original).

This court disagrees with the Wyoming court's conclusion. First, *Rosebud* is not dispositive. In *Rosebud,* applying the minimum royalty provisions did alter the royalty rate at a time other than at readjustment. Second, The court does not believe that changing the statutory minimum royalty rate alters Coastal States' leases. Those leases do not give Coastal States the right to the minimum royalty of the 1920 Act in perpetuity.

affairs pointed out a major weakness of the then current federal coal leasing program: "[T]he public is being paid a pittance for its coal reserves." H.R.Rep. No. 681, 94th Cong., 1st Sess. 17, U.S.Code Cong. & Admin.News 1976, pp. 1943, 1953. To remedy that problem, the FCLAA placed "a minimum royalty of 12.5% of the value of the coal ... *on all new leases* except underground mines. *Id.* at 18 (emphasis added).

The court finds that the FCLAA minimum royalty provisions do apply to pre-FCLAA leases at the time of readjustment. The court reaches this conclusion for several reasons. First, that interpretation of the statute is consistent with the basic purpose of the FCLAA: "[T]o assure ... development [of federal coal lands] in a manner compatible with the public interest." H.R. Rep. No. 681, 94th Cong., 1st Sess. 8, U.S. Code Cong. & Admin.News 1975, p. 1943.

Second, if the FCLAA minimum royalty provisions applied only to new leases, there would be no market for new leases. Of the 533 active federal coal leases in existence in 1976, only 59 were then producing coal. *Id.* at 9. The Department of the Interior had "leased coal rights far ahead of market demand for coal at prices too low to profit the public." *Id.* at 11, quoting The Council on Economic Priorities, "Leased and Lost: A Study of Public and Indian Coal Leasing in the West." It would have been ineffective to provide for new, more profitable royalties on new leases when "a sizeable portion" of the federal coal reserves had already been leased to private concerns under far less favorable terms. *Id.* at 9.[15]

■ Third, and perhaps most important, the FCLAA repealed the minimum royalty provided by the Act of 1920.[16] If the FCLAA minimum royalty did not apply to pre-FCLAA leases at the time of readjust-

ment, there would be no statutory minimum royalty for those leases. This court cannot believe Congress intended such a result.

Accordingly, the FCLAA minimum royalty provisions apply to Coastal States's leases. Because the court reaches this conclusion based solely on an interpretation of the FCLAA itself, it is not necessary to determine whether the Secretary had statutory authority to impose those provisions on pre-FCLAA leases by regulation. Similarly, it is not necessary to determine whether 43 C.F.R. § 3451.1(a)(2), which actually imposed those provisions on pre-FCLAA leases, is arbitrary, capricious, or an abuse of discretion.

## B. The Secretary's Decision to Apply an 8 Percent Royalty Rate to Coal Removed by Underground Operations.

■ Coastal States next argues that 43 C.F.R. § 3473.3–2 lacks a rational basis and is otherwise arbitrary, capricious, and an abuse of discretion. 30 U.S.C. § 207 provides that "[a] lease shall require payment of a royalty in such amount as the Secretary shall determine of not less than 12½ per centum of the value of coal as defined by regulation, except that the Secretary may determine a lesser amount in the case of coal recovered by underground mining operations." Pursuant to that authority, the Secretary promulgated 43 C.F.R. § 3473.3–2, which provides as follows:

(a)(3) A lease shall require payment of a royalty of not less than 8 percent of the value of the coal removed from an underground mine, except that the Minerals Management Service may determine a lesser amount, but in no case less than 5 percent if conditions warrant.

---

**15.** The House Report indicates that the federal government owns half of the total coal reserves in the nation. The reserves under lease and available for development since 1970 contained 16 billion tons of coal. Yet in 1974, federal coal leases produced only 20.6 million tons of coal, or slightly more than 3 percent of the national total.

**16.** Coastal States takes the position that because the Act of 1920 was in effect at the time it entered its leases, its leases must always be governed by the royalty provisions of the Act of 1920. This position is untenable. Congress repealed the minimum royalty provisions of the Act of 1920 when it passed the FCLAA. This court cannot judicially resurrect a law Congress repealed.

Coastal States asserts that the choice of an 8 percent rate, rather than some other rate, lacks a rational basis and is otherwise arbitrary, capricious, and an abuse of discretion.

The Secretary takes the position that the statutory 12½% royalty rate is reasonable merely because Congress, in the exercise of its plenary authority over public lands, found it to be reasonable; and therefore, any amount less than 12½% must also be reasonable. The Secretary's position begs the question. The Administrative Procedure Act requires this court to "hold unlawful and set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (1982). It is not enough to assert that the regulation is reasonable. The agency must "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts and the choice made.'" *Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Ins. Co.*, 103 S.Ct. at 2866–67, quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168, 83 S.Ct. 239, 245, 9 L.Ed.2d 207 (1962). In other words, the Secretary must explain why he chose 8% rather than 5%, 10% or some other rate.

█ At this point, the record does not contain a factual basis on which the court can base a summary judgment, either for the Secretary or for Coastal States, on whether the agency has examined the relevant data and has articulated a satisfactory explanation for its choice of an 8% royalty rate for coal removed by underground mining operations. Although the Secretary asserts that the Rulemaking Record is before the court, the court has been unable to identify any contemporaneous statements which set forth the factors that the Secretary considered and which explain the Sec-

retary's choice of the 8% rate. Accordingly, the Secretary's Motion for Summary Judgment on Coastal States' third cause of action must be denied.

█ Coastal States asserts that the absence of a sufficient record to support the regulation mandates summary judgment in its favor. The court disagrees. Summary judgment is appropriate only when there is no genuine issue as to any material fact. It must be based on facts, not on an absence of facts. Coastal States cannot merely rely on the Secretary's failure to supply an adequate record, for it too has an obligation to supply a record. It must point out to the court what factors the Secretary considered; it must tell the court how the Secretary explained his decision. At the very least, it must state in an affidavit that it has searched the relevant materials and is unable to locate contemporaneous statements which indicate the factors considered and which explain the agency's final decision. Absent such a factual basis, the court cannot conclude that Coastal States is entitled to judgment as a matter of law. Accordingly, Coastal States' Motion for Summary Judgment on its third cause of action must be denied.[17]

## III. FOURTH THROUGH EIGHTH CAUSES OF ACTION.

█ Coastal States asserts that the readjustment is unlawful because Coastal States is now obliged to make monthly rather than quarterly royalty payments, because the amount of the bond has been substantially increased, because future periods between readjustment will be ten years rather than twenty years, and because certain special stipulations have been imposed. The court has examined each of these contentions and finds them to be without merit. The United States reserved the right to make reasonable readjust-

17. Coastal States also asserts that applying the 8% rate to its leases was not required by regulation, and that applying the FCLAA to pre-existing leases took contractual property rights from Coastal States without compensation in violation of the fifth amendment. Because the court has been unable to determine as a matter of law whether 43 C.F.R. § 3473.3–2 lacks a rational basis and is otherwise arbitrary, capricious, and an abuse of discretion, these remaining questions are not yet properly before the court.

ments in the lease provisions. The court finds that each of the readjusted terms Coastal States complains of in its fourth through eighth causes of action is reasonable. For the United States to readjust the terms of the leases in accordance with its contractual rights is not arbitrary, capricious, an abuse of discretion, or otherwise contrary to law. Accordingly, the Secretary's Motion for Summary Judgment on Coastal States' fourth through eighth causes of action should be granted, and Coastal States' Motion for Summary Judgment on its fourth through eighth causes of action should be denied.

## IV. CONCLUSION.

Coastal States' Motion for Summary Judgment is DENIED. The Secretary's Motion for Summary Judgment on Coastal States' first, second, fourth, fifth, sixth, seventh, and eighth causes of action is GRANTED. The Secretary's Motion for Summary Judgment on Coastal States' third cause of action is DENIED.

SO ORDERED.

## MEMORANDUM OPINION AND ORDER

This litigation concerns the validity of regulations promulgated by the Secretary of the Interior setting the royalty rate to be paid on government coal leases at 8 percent of the value of the coal extracted from underground mines. The matter came before the court on November 21, 1985, for a hearing on the parties' cross-motions for summary judgment on the plaintiff's third cause of action. Lawrence E. Stevens, Patrick J. Garver, Kevin Yocum and Brian E. McGee appeared representing the plaintiff, Coastal States Energy Company. Peter Stirba, Assistant United States Attorney, appeared representing the federal defendants. K.L. McIff appeared on behalf of the *amici curiae*, Unelco, Inc., et al. The court heard oral arguments and took the matter under advisement. Having considered the parties' extensive memoranda and having reviewed the administrative record placed before the court, the court now enters this memorandum opinion and order.

## A. BACKGROUND

### 1. Facts

The following facts are undisputed. On September 11, 1941, the United States, as lessor, and Lorenzo R. Hansen, as lessee, entered into coal lease number SL062583; on March 1, 1962, the United States, as lessor, and Southern Utah Fuel Company and Equipment Rental Service, as lessees, entered into coal lease number UO62453 (the "subject leases"). The subject leases were issued pursuant to the Mineral Lands Leasing Act of 1920, 41 Stat. 437, codified at 30 U.S.C. §§ 49, 50, 181 et seq., 351 et seq. Coastal States, the successor to the original lessees, operates an underground coal mine in Sevier County, Utah; the subject leases form a major part of that mine.

The subject leases provided for royalty payments of 15 cents per ton, but also gave the United States the right to readjust the royalty payable under the leases every twenty years. In 1981, the Bureau of Land Management timely notified Coastal States that the terms and conditions of the subject leases would be readjusted. The proposed readjustments included increasing the royalty rate from 15 cents per ton to 8 percent of the value of the coal removed by underground mining.

The proposed royalty rate readjustment was pursuant to the Federal Coal Leasing Amendments Act of 1976, 90 Stat. 1083, codified at 30 U.S.C. §§ 184, 191, 201, 202a, 203, 207, 208-1, 208-2, 209, 352 (the "FCLAA"). The FCLAA, which amended the Mineral Leasing Act of 1920, provides in pertinent part:

A lease shall require payment of a royalty in such amount as the Secretary shall determine of not less than 12½ per centum of the value of coal as defined by regulation, except the Secretary may determine a lesser amount in the case of coal recovered by underground mining operations. . . .

30 U.S.C. § 207.

Coastal States filed timely objections to the proposed readjustment of the subject

leases, but the BLM overruled those objections. Coastal States then appealed to the Interior Board of Land Appeals, which upheld the BLM decision. 70 IBLA 386, Feb. 9, 1983. Coastal States then filed this lawsuit to obtain judicial review of the IBLA's administrative decision pursuant to section 10 of the Administrative Procedure Act, 5 U.S.C. §§ 701–706.

■■■ Coastal States' complaint contained eight causes of action challenging the legality of certain regulations and practices of the Department of the Interior relating to the lease readjustments. By a memorandum opinion and order dated August 2, 1985, this court granted the defendants' motion for summary judgment dismissing all of Coastal States' causes of action except the third. The court also disposed of so much of the third cause of action as challenged the applicability of the FCLAA minimum royalty provisions to leases, such as the subject leases, entered into before the FCLAA was enacted. What remains of Coastal States' third cause of action is basically an allegation that the Secretary's final regulations imposing an 8 percent royalty rate ceiling on existing underground coal leases upon readjustment (43 C.F.R. §§ 3451.1(a)(2) and 3473.3–2(a)) are without a rational basis in the rulemaking record and are otherwise arbitrary, capricious, an abuse of discretion and contrary to law.[1]

In its August 2 opinion, this court denied the defendants' motion for summary judgment dismissing Coastal States' third cause of action because, based on the record then before it, the court was not able "to identify any contemporaneous statements which set forth the factors that the Secretary considered and which explain the Secretary's choice of the 8% rate." Memorandum Opinion and Order of August 2, 1985, at 29. The court could not then determine

"whether the agency has examined the relevant data and has articulated a satisfactory explanation for its choice of an 8% royalty rate for coal removed by underground mining operations." *Id.* The court suggested that the parties attempt to provide a complete rulemaking record and to direct the court's attention to the relevant portions thereof. At the November 21 hearing on the instant motions, all present agreed that the complete rulemaking record is now before the court. One item of substance that has been added is an affidavit of Cecil D. Andrus, the former Secretary of the Interior responsible for the promulgation of the challenged regulations.

## 2. Administrative Procedure

The record before the court reveals the following administrative history relative to the challenged regulations. Pursuant to section 207 of the FCLAA, and as part of an effort to revamp the nation's coal mining policy, the Secretary undertook to set by regulation the royalty rates to be applied to both surface and underground mines. Initially, the Secretary did not exercise the discretion granted him by section 207 of the FCLAA, but instead proposed to set the royalty rate for coal removed from both surface and underground mines at 12½ percent. *See* 41 Fed.Reg. 48124, 48124–25 (1976) (proposed rule 3503.3–3(a) & (b)). The Secretary invited interested parties to comment on his proposal in writing on or before December 13, 1976. *Id.* at 48124. Kaiser Steel Corporation timely objected, citing the higher costs associated with underground mining as justification for its request that the Secretary exercise his discretion to set a lower royalty rate for coal recovered from underground mines.

---

**1.** The third cause of action also challenges the Secretary's interpretation of the regulations as imposing a rate of 8 percent unless the lessee can justify a lower rate. Coastal States claims that the regulation requires a rate of 5 percent. The court finds that claim to be without merit. Likewise, the court summarily disposes of Coastal States' claims that the Secretary's action constituted a breach of the subject leases or infringed Coastal States' contractual property rights without due process of law as being without merit. The leases themselves provide for readjustment of the applicable royalty rate.

On January 25, 1977, the Secretary published the final version of 43 C.F.R. § 3503.3–3, which stated in part as follows:

(a) A coal lease shall require payment of a royalty of not less than 12½ per centum of the value of the coal removed from a surface mine.

(b) A coal lease shall require payment of a royalty of not less than 8 per centum of the value of the coal removed from an underground mine, except that the authorized officer may determine a lesser amount if conditions warrant.

42 Fed.Reg. 4442, 4452 (1977). Presumably, the lower rate applicable to coal removed from underground mines was in response to Kaiser's comment.

As the court indicated in its August 2 opinion, there was no contemporaneous explanation in the rulemaking record of why a rate of 8 percent was chosen. However, prior documents help explain the choice of an 8 percent rate. Before the FCLAA was passed, the Department of the Interior apparently assembled a task force to consider the Department's policy on coal royalty levels. The task force discussed adopting a "normal" rate of 8 percent for both surface and underground coal, subject to variations up or down based on good cause. *See* Department of the Interior Memorandum, March 5, 1975 (Exhibit B to Federal Defendants' Response Memorandum). A memorandum to the Under Secretary from the Assistant Secretary—Program Development & Budget, dated February 26, 1976, recommended the 8 percent rate based, among other things, on comparative lease rates ("Royalties being charged on recent Western leases range from 5 percent to 10 percent") and on the fact that an 8 percent rate "would just offset the major government policy which encourages production—the depletion allowance." Department of the Interior Memorandum, February 26, 1975 (Exhibit B to Federal Defendants' Response Memorandum). Thus the 8 percent figure was not simply pulled out of thin air.

Following the 1977 regulations, an environmental impact statement on the federal government's coal leasing policy that had been challenged in the courts was found deficient. *NRDC v. Hughes,* 437 F.Supp. 981 (D.D.C.1977), *modified,* 454 F.Supp. 148 (D.D.C.1978). Rather than attempting to correct the deficiencies in that EIS, the Secretary decided to start from scratch. Thus, on December 15, 1978, the Secretary gave notice that he intended "to propose rulemaking for the purpose of adopting a new Federal coal management program." 43 Fed.Reg. 58776 (1978). Concurrently with that notice, the Secretary released a new draft EIS. The draft EIS considered the environmental impacts of seven alternatives for a federal coal management program, with the "preferred program" described in Chapter 3. Appendix A to the draft EIS contained a set of example regulations "intended to indicate the form and content of regulations the Department will propose in accordance with this notice if the Secretary were to select the preferred program." Draft Environmental Impact Statement, December 1978, Appendix A, at A–1. Among the example rules was one apparently intended to supplant former 43 C.F.R. § 3503.3–3:

(a) Royalty rates shall be determined on an individual basis prior to lease issuance. Such rates shall be set out in the notice of competitive lease sale.

(1) A coal lease shall require payment of a royalty of not less than 12½ percent of the value of the coal removed from a surface mine.

(2) A coal lease shall require payment of royalty [sic] of not less than 8 percent of the value of the coal removed from an underground mine, except that the authorized officer may determine a lesser amount if conditions warrant.

Example Rule .§ 3473.3–2, Draft Environmental Impact Statement, December 15, 1978, Appendix A, at A–37. The publication of the example rules was intended to "offer interested citizens an extra period of time to become thoroughly familiar with the preferred program and to develop their views on it prior to being requested to make specific comments on the proposed

regulations." 43 Fed.Reg. 58776, 58777 (1978). Coastal States submitted extensive written comments on the draft EIS, but none objected to the 8 percent royalty rate on underground mines or raised the question whether that rate would apply to the subject leases on readjustment.

On March 19, 1979, the Secretary published the proposed rules that are challenged in this litigation and invited comment thereon until May 18, 1979. Proposed Rule 3473.3–2 provided in part as follows:

(a)(1) Royalty rates shall be determined on an individual case basis prior to lease issuance *and upon lease readjustment.* For competitive leases, initial royalty rates shall be set out in the notice of lease sale.

(2) A lease shall require payment of a royalty of not less than 12½ percent of the value of the coal removed from a surface mine.

(3) A lease shall require payment of a royalty of not less than 8 percent of the value of the coal removed from an underground mine, except that the authorized officer may determine a lesser amount, but in no case less than 5 percent if conditions warrant.

44 Fed.Reg. 16800, 16843 (1979) (emphasis added). Proposed rule 3451.1 further provided in part:

(a) All leases issued prior to August 4, 1976, shall be subject to readjustment at the end of the current 20-year period and at the end of each 10-year period thereafter. All leases issued after August 4, 1976, shall be subject to readjustment at the end of the first 20-year period and each 10-year period thereafter, if the lease is extended.

*Id.* at 16832. Coastal States commented on this latter provision, asking the Secretary to clarify what rate would apply to leases subject to readjustment after August 4, 1976, but before January 1, 1980. It did not ask what rate would apply to leases, such as the subject leases, up for readjustment after January 1, 1980.

The notice of proposed rulemaking explained the differences between the example rule and the proposed rule at 44 Fed. Reg. 16800, 16808 (1979), but that explanation contains no reference to the underlined provision added to the proposed rule that royalty rates would be determined individually upon lease readjustment. Coastal States alleges, and the defendants do not dispute, that the Secretary's practice with respect to existing leases was to consider each lease individually to determine an appropriate readjusted royalty rate.[2] The proposed rules appear to codify that practice.

In April 1979, the Secretary released the final EIS on the preferred program. The final EIS contains a lengthy discussion of the administration of existing leases under the preferred program. Final Environmental Impact Statement, Federal Coal Management Program, April 1979, § 3.2.-10, at 3–68. Much of that discussion centers on the FCLAA's diligence requirements, but the following specifically discusses royalties:

All existing leases are also subject to readjustment every 20 years after their issuance. In addition to expressly imposing due diligence requirements at the time of readjustment, the Department will also raise royalties to at least 12.5 percent for coal mined by surface methods and eight percent for coal mined by underground methods. Current rates are as low as 5 cents per ton with the rates of 10 cents to 15 cents per ton being fairly common.... On March 16, 1979, the Under Secretary endorsed the policy of systematically readjusting leases which are now pending readjustment or will become due for readjustment prior to June 1, 1979, to the prescribed

---

**2.** *See* Memorandum of Points and Authorities in Support of Plaintiff's Renewed Motion for Summary Judgment (Third Cause of Action), Statement of Uncontested Material Facts ¶ 41, at 5–6. The defendants' responsive memorandum does not dispute that statement. Therefore, according to Rule 5(e) of the rules of practice of this court, that statement is deemed admitted for purposes of this motion.

minimum royalties, rather than attempting to establish possibly higher royalties on a case-by-case basis. This policy was adopted in order to complete the backlog of readjustments promptly.

*Id.* at 3–71.

The March 16, 1979, endorsement referred to appears at the bottom of a memorandum from the Assistant Secretary—Land and Water Resources to the Under Secretary, dated March 8, 1979. That memorandum states in part:

I am recommending concurrence in the proposed policy on page 7 of the attached memo [imposing the 8 percent rate upon lease readjustment]. I emphasize that this policy is interim only pending the completion of the work of the fair market value task force and the Secretary's June 1 decision. It is quite possible that readjustments of all leases which become due for readjustment after that date will be based on individual economic evaluations.

Department of the Interior Memorandum, March 8, 1979 (Exhibit K to Federal Defendants' Response Memorandum).

Sometime between the final EIS and the publication of the final regulations, the Department issued a Secretarial Issue Document. That document purports to "set forth all the issues which must be considered and decisions which are to be made in determining the need for, and making the selection of, a federal coal management program." Secretarial Issue Document, at 1. At page 105, the paragraph quoted above from the final EIS is reproduced under the heading "Federal Coal Management Program Description." Under the heading "Issue Identification" appears "*New Issue:* How should the royalties be determined in readjusting leases?" followed by 4 "options." Under the heading "Secretarial Action and Comments" appear the date "6/2/79" and the initials "CDA" in a blank opposite the words "Option 1." Option 1 is to "readjust each lease for ... 8% royalty for underground mined coal subject to modification as low as 5% if the lessee can demonstrate to the satisfaction

of the Department that an 8% royalty would make the lease noneconomic...."

Part of the Secretarial Issue Document referred to as "Issue Paper 13" discusses in some detail the various options, including the pros and cons of each, and explains as follows why option 1 was recommended:

The interim policy was recommended primarily because no lower rates could be charged under law or existing Departmental regulation and the attached data suggest that in few or no cases would higher rates be charged even if individual economic analyses were conducted. However, the recommendation was also made because of manpower considerations.... [I]t would appear that the Department cannot as a practical matter afford to do individual evaluations at this time whatever it might like to do ideally.

Secretarial Issue Document, at 145–146.

The final regulations, published on July 19, 1979, differed slightly from the previously published proposed rules:

(a)(1) Royalty rates shall be determined on an individual case basis prior to lease issuance. For competitive leases, royalty rates shall be set out in the notice of lease sale.

(2) A lease shall require payment of a royalty of not less than 12½ percent of the value of the coal removed from a surface mine.

(3) A lease shall require payment of royalty [sic] of not less than 8 percent of the value of the coal removed from an underground mine, except that the authorized officer may determine a lesser amount, but in no case less than 5 percent if conditions warrant.

44 Fed.Reg. 42584, 42647–48 (1979) (to be codified at 43 C.F.R. § 3473.3–2). The reference in the proposed rules to individual consideration of royalty rates upon lease readjustment was omitted. Further, the final regulations added a new paragraph to Subpart 3451, which deals specifically with readjustment:

(2) Any lease subject to readjustment which contains a royalty rate less than the minimum prescribed in § 3473.3–2 of

this title shall be readjusted to conform to the minimum prescribed in that section.

44 Fed.Reg. 42584, 42635 (1979) (to be codified at 43 C.F.R. § 3451.1(a)(2)). The defendants claim that the latter provision was added in response to Coastal States' request that the Secretary clarify what rate was to be applied to leases subject to readjustment after August 1, 1976.

The notice of final rulemaking comments on the above changes as follows:

> Subpart 3451 of the proposed rulemaking concerns the readjustment of coal leases. It has been substantially revised as suggested in a number of comments and to conform to the Secretary of the Interior's decision to readjust lease royalties to the prescribed statutory and regulatory minimum rates. A new paragraph 3451.-1(a)(2) implements that decision.

44 Fed.Reg. 42584, 42601 (1979). The final rules thus make clear the Secretary's decision not to automatically undertake individual lease consideration, as apparently had been his practice. The final rules also make clear, however, that the 8 percent rate was not etched in stone; it was a ceiling, to be sure, but the Secretary remained willing to undertake individual lease consideration and lower that rate upon application and a proper showing by the lessee.[3]

**3.** The final rules set forth the procedure for reducing the applicable royalty at 43 C.F.R. § 3485.2, as follows:

"(c)(1) The authorized officer may *waive, suspend, or reduce* the rental on a Federal lease, or *reduce the Federal royalty,* but not advance royalty, on a federal lease or portion thereof.

    \*    \*    \*    \*    \*    \*

"(2) An application for any of the above benefits shall be filed in triplicate in the office of the authorized officer.

    \*    \*    \*    \*    \*    \*

"(ii) Each application shall contain a detailed statement of expenses and costs of operating the entire mine, the income from the sale of coal, and all facts indicating whether the mine can be successfully operated under the Federal rental and royalty provisions fixed in the Federal lease or why the reduction is necessary to promote development."

(Emphasis added). 43 C.F.R. § 3473.3–2(d) empowers the Secretary to reduce the royalty

**B. ANALYSIS**

Coastal States argues that the challenged regulations lack a rational basis in the rulemaking record and are otherwise arbitrary or capricious. That argument has both a substantive and a procedural aspect. Substantively, Coastal States argues that the Secretary failed to consider all the relevant factors in deciding to impose an 8 percent royalty rate on existing leases upon readjustment. Procedurally, Coastal States argues that it was not given notice that the Secretary was even considering such a decision, and that it was therefore denied a meaningful opportunity to comment and otherwise participate in the rulemaking process. The court will deal with those arguments in order.

### 1. Substantive Validity of the Regulations

■ The Secretary's determinations as to the substance of regulations to implement the FCLAA is entitled to some deference. *See Ramoco, Inc. v. Andrus,* 649 F.2d 814, 816 (10th Cir.), *cert. denied sub nom. Ramoco, Inc. v. Watt,* 454 U.S. 1032, 102 S.Ct. 569, 70 L.Ed.2d 475 (1981). The court is mindful of the exigent circumstances surrounding the revamping of the nation's coal policy. The Department of the Interior was obligated to develop the country's coal reserves as well as to protect the country's environment. Therefore, the

"whenever he/she determines it necessary to promote development or finds that the lease cannot be successfully operated under its terms." The notice of rulemaking explains: "The final rulemaking reinstates the authority of the Secretary to *reduce the royalty* below the statutory minimum that must be fixed in each lease, in the exercise of his authority under Section 39 of the Mineral Leasing Act (30 U.S.C. 209), when (a) a lessee applies for such a reduction, (b) it would be in the interest of conservation of the resources, and (c) the lease cannot be successfully operated under its terms. This authority to reduce production royalty below that specified in the lease will be used sparingly, if at all, only upon a showing of hardship, and only for a temporary period or periods on any lease." 44 Fed.Reg. 42584, 42607–08 (1979) (emphasis added).

standard to be followed in reviewing the substance of the challenged regulations is well articulated as follows:

> [W]e will be content in carrying out our substantive review ... first, to insist upon an explanation of the facts and policy concerns relied on by the agency in making its decision; second, to see if those facts have some basis in the record; and finally, to decide whether those facts and those legislative considerations by themselves could lead a reasonable person to make the judgment that the agency has made.

*Weyerhaeuser Co. v. Castle,* 590 F.2d 1011, 1026–27 (D.C.Cir.1978).

The rulemaking record at the time of the August 2 opinion, although voluminous, was not focused on the "facts and policy concerns relied on by the agency in making its decision." Since then the defendants have augmented the record with an affidavit of Cecil D. Andrus, the Secretary of the Interior at the time the Regulation was promulgated. Secretary Andrus' affidavit helps the court to focus on the factors that went into the Secretary's rulemaking decision.[4] The affidavit reveals that the Secretary and others involved in promulgating the Regulation did indeed consider the relevant factors. In deciding to fix the royalty rate at 8 percent rather than 12½ percent or 5 percent or lower, the Secretary considered existing Department policy; he sought comparative royalty rates; he published the proposed rate and invited comments thereon; he considered what comments he did receive on the proposed rate; and he noted the lack of objection to the proposed 8 percent rate. In deciding to fix a normal ceiling rate rather than undertake individual consideration in every case, he balanced the likely benefits of such a rule against the substantial costs of individual consideration. He determined that he could not as a practical matter undertake individual review of every lease, given limited manpower and the number of leases up for readjustment.

One fact, however, stands above the rest: The Secretary felt, based on the above considerations, that the 8 percent blanket rate was reasonable; but if in an individual case it was not, then *there was a procedure for an individual lessee to seek review and relief.* If a lessee could show that, given all the factors unique to his mining operation, an 8 percent royalty rate was economically unfeasible, then the Secretary was empowered to reduce the royalty. The Secretary states:

> We were concerned that the 8 percent royalty rate be a fair and reasonable rate to impose, and I certainly did not want the Department to adopt a royalty rate that was too high so that industry could justify not mining certain coal deposits based upon claims that the royalty rate made the mining uneconomical. At the same time we were aware of the congressional mandate to obtain a fair return to the public. With these concerns in mind

---

4. The plaintiff strenuously objects to Secretary Andrus' affidavit as "post hoc rationalization" that cannot supply the contemporaneous explanation lacking in the record. That objection is generally well taken, for it is all too easy for a rulemaker to respond as did Robert Browning when asked whether he intended such-and-such by a poem: "That's what I mean by it now." *See* Davis, *Administrative Law Treatise* § 6.5, at 461 (2d ed. 1978). In the ideal case, the record would contain a complete explanation of all the factors relevant to the administrative decision. No case is ideal, however; even the best rulemaking record simply does not capture the complex mixture of facts, values, philosophies and experiences that contribute to a particular decision. The Court of Appeals for the First Circuit, when forced to review the substance of agency action on the basis of an inadequate rulemaking record, took an eminently reasonable approach—it asked the Secretary to provide an "additional explanation of the reasons for the agency decision." *Maine v. Kreps,* 563 F.2d 1043, 1051 (1st Cir.1977). Then, after it had received and considered the requested explanation, it held that the Secretary "did not act in an arbitrary or capricious manner or contrary to law." *Maine v. Kreps,* 563 F.2d 1052, 1055 (1st Cir.1977). The purpose of a rulemaking record is really to allow the persons affected and, if called upon, the courts, to ensure that the agency has acted in a reasonable manner. The fact that former Secretary Andrus has already furnished this court with an "additional explanation" simplifies the matter and allows this court to review the substance of his decision without further delay.

we at the Department felt further justified in the choice of the 8 percent rate because the regulation and the statutory law controlling at the time still allowed for a coal operator to obtain a lesser rate upon a showing of economic hardship. Thus, if the operator could justify a lesser rate, the Department had the option to impose one. Although we at the Department did not believe the 8 percent royalty rate to be an unreasonable one, if a particular operator could make such a showing, he could have sought relief.

Affidavit of Cecil D. Andrus, ¶ 9.

In short, consideration of all the relevant factors in an individual case was built in to the regulations and was available to individual lessees upon application and a proper showing. Such built-in flexibility is a frequently used administrative tool that the courts have held to save an otherwise inflexible rule from being set aside. *See, e.g., Kennecott Copper Corp. v. EPA,* 612 F.2d 1232, 1243–44 (10th Cir.1979) (upholding industry-wide regulations challenged for failure to consider the relevant factors in individual cases, because the regulations included a variance procedure that allowed those factors to be applied to fundamentally different situations upon application by individual plant operators); *Weyerhaeuser v. Costle,* 590 F.2d at 1040–41 (upholding the promulgation of industry-wide effluent limitations because the "crucial" variance mechanism provided the necessary flexibility). Coastal States did not take advantage of the available procedure to have the royalty rate on the subject leases reduced from 8 percent. Under the regulations, the Secretary is authorized to "waive, suspend or reduce" the royalty if the lessee applies for individual consideration and can make the required showing. *See* 43 C.F.R. § 3485.2(c). Coastal States' failure to request individual consideration and direct the Secretary's attention to the relevant factors unique to its underground mining operation denigrates its claim that the Secretary failed to consider those factors.

Highlighted by the Secretary's affidavit, the rulemaking record corroborates the factors that went into the Secretary's decision to impose an 8 percent royalty rate on all readjusted leases unless the lessee could justify a lower rate. The most relevant document in the rulemaking record is Secretarial Issue Paper 13. That document, and its attached memoranda, discuss the following factors:

(1) The 8 percent rate was a continuation of Department policy set in 1976 by then-Under Secretary Lyons, which policy was to set an 8 percent standard rate and allow deviation up or down depending on individual circumstances. *See* Secretarial Issue Paper 13, at 145, 154–157.

(2) Comparative leases rates generally ranged from 5 percent to 10 percent, although one attachment shows several leases in Utah as low as 2 or 3 percent. *Id.* at 150–51, 156.

(3) The cost of individual lease consideration was deemed prohibitive in terms of both time and money, and those costs would not likely be offset by royalties higher than 8 percent even if individual consideration were undertaken. The Secretary was thus willing to forego the possibility of higher rates. *Id.* at 146.

(4) An 8 percent rate would just offset the federal depletion allowance and thus not discourage production. *Id.* at 156.

(5) The 8 percent rate, which on its face was significantly lower than the 12½ percent rate suggested in the FCLAA and imposed on surface leases, took into account the greater costs of underground mining as compared with surface mining.

(6) Most importantly, any lessee could seek individual consideration and the Secretary could reduce the 8 percent rate if the lessee could show that the blanket 8 percent rate would be uneconomical. *Id.* at 145.

Given the Secretary's explanation of the factors considered in his promulgating the Regulation, and given this court's finding that the rulemaking record reflects those factors, the only remaining issue is whether those reasons could lead a reasonable person to make the judgment that the Sec-

retary made. *See Weyerhaeuser v. Costle,* 590 F.2d at 1027. This court finds that they could and did.

█ Faced with the prospect of individually reviewing many leases up for readjustment, charged with a mandate to develop coal reserves while preserving the environment, and burdened with increasing demands on decreasing resources (both fiscal and manpower), the Secretary exercised considerable skill and judgment in formulating a procedure to accommodate all of those competing concerns. The imposition of a blanket 8 percent rate upon lease readjustment, with the possibility of a lower rate on a showing of economic hardship, reflects a careful balancing of the relevant factors. It simply was not the unwarranted and catastrophic agency decision that the plaintiff depicts it to be. This court therefore finds that the challenged regulations are substantively valid.

### 2. Adequacy of the Rulemaking Procedure

█ Coastal States of late raises the additional argument that it was not given notice of or an opportunity to comment on the Secretary's decision to impose an 8 percent royalty rate on its existing leases upon readjustment.[5] Thus the parties argue at length about whether 5 U.S.C. § 553 applies to this case. That statute generally requires what has come to be known as "notice and comment procedure."[6] The

defendants claim that the Secretary's action falls within 5 U.S.C. § 553(a), which excepts from the statute any "matter relating to ... public property ... or contracts." Because this is indeed a matter relating to public property (federal coal lands) or contracts (federal coal leases), the exception of § 553(a) technically applies. However, even if Coastal States was entitled to notice and an opportunity to comment, the court finds that such were afforded here.

It cannot be doubted that the Secretary generally bent over backwards to provide notice and an opportunity to comment during the rulemaking process. He not only published proposed rules and allowed 2 months to comment thereon, but before that he published example rules to allow interested persons to begin to digest the complex regulatory scheme. Coastal States nevertheless complains that, as to the specific regulations challenged here, it had absolutely no notice or opportunity to comment before the promulgation of the final regulations. The court disagrees.

The example and proposed rules both clearly suggest a royalty rate not lower than 8 percent to be applied to underground coal leases. Coastal States argues that the example and proposed rules applied that rate only to new leases, not to existing leases upon readjustment, but the proposed and example rules do not so limit the applicability of the 8 percent rate. Coastal States then argues that it was the

---

5. I say "of late" because, in a colloquy with the court on February 14, 1984, counsel for Coastal States made clear that Coastal States did not challenge the procedure by which the challenged regulations were promulgated. *See* Transcript of Hearing, February 14, 1984, at 98–99. Nevertheless, the procedural challenge is a main part of Coastal States' memoranda on this motion, so the court will address it.

6. 5 U.S.C. § 553 provides in part:
"(b) General notice of proposed rule making shall be published in the Federal Register, unless persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law. The notice shall include—
(1) a statement of the time, place, and nature of public rule making proceedings;

(2) reference to the legal authority under which the rule is proposed; and
(3) either the terms or substance of the proposed rule or a description of the subjects and issues involved.

\* \* \* \* \* \*

"(c) After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments.... After consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose.

\* \* \* \* \* \*

"(d) The required publication or service of a substantive rule shall be made not less than 30 days before its effective date...."

Secretary's practice to determine the royalty rate applicable to existing leases on a case-by-case basis, and that any rule abandoning that practice should have been set forth with some clarity. It is true that the proposed rules promised individual lease consideration, apparently in line with the Secretary's practice. But Coastal States mistakenly asserts that the final rules abandoned that practice entirely. The final rules authorize the Secretary to "waive, suspend or reduce" the royalty upon application and a proper showing by an individual lessee. *See* 43 C.F.R. § 3485.2(c). Thus the final rules clearly provide for individual consideration; they merely place the burden on the individual lessee, who after all is intimately familiar with his peculiar circumstances and knows the effect of an 8 percent rate on his particular operation, to request such consideration.

Even if there was some ambiguity in the example or proposed rules that could be said to work an injustice on Coastal States, the final EIS resolves that ambiguity by unequivocally giving notice that the royalty rates on "all existing leases" would be raised "to at least 8 percent for coal mined by underground methods." Coastal States had several weeks before the end of the official comment period and up to 3 months before the promulgation of the final regulations to comment on the proposed rules in light of that notice. In addition, the Secretarial Issue Document, including Issue Paper 13, was available about a month prior to the promulgation of the final regulations. That document fully laid out all of the relevant factors that the Secretary considered, but no challenge was then raised. Finally, it should be noted that Coastal States did comment on the proposed rules, requesting a clarification of what rate was to apply to leases subject to readjustment before January 1, 1980. One might infer that Coastal States well knew that leases subject to readjustment after that date would be readjusted at the 8 percent rate. For all of these reasons, Coastal States should not now be heard to complain that it had absolutely no prior notice of the final regulations, and thus accomplish by proce-

dural challenge what it evidently felt it could not justify through the available procedure—a royalty reduction.

## C.  CONCLUSION

The court finds that the challenged regulations are substantively valid and were promulgated by fair and adequate procedures. Accordingly, the court orders that the plaintiff's motion for summary judgment on its third cause of action be and hereby is DENIED, and that the defendants' motion for summary judgment dismissing the plaintiff's third cause of action in its entirety be and hereby is GRANTED.